UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on May 15, 2009

**SUPERSEDING INDICTMENT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CRIMINAL NO. 08-057 |
| **v.** | : | |
| | : | |
| **ANTONIO EZEQUIEL** | : | **VIOLATIONS:** |
| **CARDENAS-GUILLEN, (1)** | : | |
| a.k.a. "Tony Tormenta"; | : | 21 U.S.C. §§ 959, 960, 963 |
| | : | (Conspiracy to Manufacture and |
| **JORGE EDUARDO** | : | Distribute Five Kilograms or |
| **COSTILLA-SANCHEZ, (2)** | : | More of Cocaine and 1000 Kilograms |
| **a.k.a. "El Cos," a.k.a "Doble X,"** | : | or More of Marijuana for Importation |
| **a.k.a. "Dos Equis";** | : | into the United States) |
| | : | |
| **HERIBERTO** | : | |
| **LAZCANO-LAZCANO, (3)** | : | |
| **a.k.a. "Lazca," a.k.a. "El Licenciado";** | : | 21 U.S.C. § 959 |
| | : | (Distribution of Five Kilograms or |
| **MIGUEL TREVINO MORALES, (4)** | : | More of Cocaine for Importation |
| **a.k.a. "40," a.k.a. "Zeta 40,"** | : | into the United States) |
| **a.k.a. "Cuarenta";** | : | |
| | : | |
| **JAIME GONZALEZ-DURAN, (5)** | : | |
| **a.k.a. "Hummer";** | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting) |
| **SAMUEL FLORES BORREGO, (6)** | : | |
| **a.k.a. "Tres," a.k.a. "Metro Tres";** | : | 21 U.S.C. § 853 |
| | : | 21 U.S.C. § 970 |
| **MARIO RAMIREZ-TREVIÑO, (7)** | : | (Forfeiture) |
| **a.k.a. "Mario Pelon," a.k.a. "X-20";** | : | |

**ALFREDO RANGEL BUENDIA, (8)**      :
**a.k.a. "Chicles";**      :
      :
**FIRST NAME UNKNOWN,**      :
**LAST NAME UNKNOWN, (9)**      :
**a.k.a. "Lino";**      :
      :
**GILBERTO**      :
**BARRAGAN-BALDERAS,  (10)**      :
**a.k.a. "Tocayo;"**      :
      :
**JUAN REYES**      :
**MEJIA-GONZALEZ, (11)**      :
**a.k.a. "R-1," a.k.a. "Kike,"**      :
**a.k.a. "Reyes";**      :
      :
**OMAR TREVINO MORALES, (12)**      :
**a.k.a. "42";**      :
      :
**JESUS ENRIQUE REJON**      :
**AGUILAR, (13)**      :
**a.k.a. "Mamito," a.k.a. "Cabellero;**      :
      :
**ALFONSO LAM-LIU, (14)**      :
**a.k.a. "Gordo Lam";**      :
      :
**ELEAZAR MEDINA ROJAS, (15)**      :
**a.k.a. "El Chelelo";**      :
                                                    :
**AURELIO CANO-FLORES, (16)**      :
**a.k.a. "Yankee," a.k.a. "Yeyo";**      :
      :
**CARLOS CERDA-GONZALEZ, (17)**      :
**a.k.a. "Puma," a.k.a. "Carlitos";**      :
      :
**VICTOR HUGO LOPEZ-VALDEZ, (18)** :
**a.k.a. "Jorge Hernandez-Martinez,"**      :
**a.k.a. "Chiri," a.k.a. "Chiriquas";**      :

| | |
|---|---|
| **SIGIFREDO** | : |
| **NAJERA-TALAMANTES, (19)** | : |
| **a.k.a. "Canicon," a.k.a. "Chito,"** | : |
| **a.k.a. "Chito Can,"** | : |
| **a.k.a. "Chito Canico,"** | : |
| **a.k.a. "Chito Canicon";** | : |
| | : |
| Defendants. | : |
| _____ | : |

### THE GRAND JURY CHARGES THAT:

### COUNT I
### CONSPIRACY TO MANUFACTURE AND DISTRIBUTE
### COCAINE AND MARIJUANA FOR IMPORTATION
### INTO THE UNITED STATES

### THE CONSPIRACY

1.        From in or about June 2006 and continuing thereafter up to and including the date

of the filing of this Superseding Indictment, the exact dates being unknown to the Grand Jury, in

the Mexico, Colombia, Guatemala, Panama, and elsewhere, defendants, **ANTONIO**

**EZEQUIEL CARDENAS-GUILLEN**, a.k.a. "Tony Tormenta," ("CARDENAS-GUILLEN");

**JORGE EDUARDO COSTILLA-SANCHEZ**, a.k.a. "El Cos," a.k.a. "Doble X," a.k.a. "Dos

Equis" ("COSTILLA"); **HERIBERTO LAZCANO-LAZCANO**, a.k.a. "Lazca," a.k.a. "El

Licenciado" ("LAZCANO"); **MIGUEL TREVINO MORALES**, a.k.a. "40," a.k.a. "Zeta 40,"

a.k.a. "Cuarenta" ("MIGUEL TREVINO MORALES"); **JAIME GONZALEZ-DURAN,** a.k.a.

"Hummer" ("GONZALEZ-DURAN"); **SAMUEL FLORES BORREGO**, a.k.a. "Tres," a.k.a.

"Metro Tres" ("FLORES BORREGO"); **MARIO RAMIREZ-TREVINO**, a.k.a. "Mario Pelon,"

a.k.a. "X-20" ("RAMIREZ-TREVINO"); **ALFREDO RANGEL BUENDIA**, a.k.a. "Chicles"

("RANGEL");  **FIRST NAME UNKNOWN, LAST NAME UNKNOWN,** a.k.a. "Lino"

("LINO");  **GILBERTO BARRAGAN-BALDERAS,** a.k.a. "Tocayo" ("BARRAGAN-

BALDERAS"); **JUAN REYES MEJIA-GONZALEZ,** a.k.a. "R-1," a.k.a. "Kike," a.k.a.

"Reyes" (MEJIA-GONZALEZ);  **OMAR TREVINO MORALES,** a.k.a. "42," ("OMAR

TREVINO MORALES"); **JESUS ENRIQUE REJON AGUILAR,** a.k.a. "Mamito," a.k.a.

"Cabellero" ("REJON AGUILAR"); **ALFONSO LAM-LIU,** a.k.a. "Gordo Lam" ("LAM-

LIU"); **ELEAZAR MEDINA ROJAS,** a.k.a. "El Chelelo" ("MEDINA ROJAS"); **AURELIO**

**CANO-FLORES,** a.k.a. "Yankee," a.k.a. "Yeyo" ("CANO-FLORES"); **CARLOS CERDA-**

**GONZALEZ,** a.k.a. "Puma," a.k.a. "Carlitos" ("CERDA-GONZALEZ"); **VICTOR HUGO**

**LOPEZ-VALDEZ**, a.k.a. "Jorge Hernandez-Martinez,"a.k.a. "Chiri," a.k.a. "Chiriquas"

("LOPEZ-VALDEZ"); **SIGIFREDO NAJERA-TALAMANTES**, a.k.a. "Canicon," a.k.a.

"Chito,"a.k.a. "Chito Can," a.k.a. "Chito Canico," a.k.a. "Chito Canicon" ("NAJERA-

TALAMANTES") and others unknown to the Grand Jury and not indicted herein, did knowingly

and intentionally combine, conspire, confederate, and agree to commit the following offense

against the United States of America: (1) to knowingly and intentionally manufacture and/or

distribute five kilograms or more of a mixture and substance containing a detectable amount of

cocaine, a Schedule II controlled substance, knowing and intending that such substance would be

imported into the United States from Mexico, and (2) to knowingly and intentionally

manufacture and/or distribute 1000 kilograms or more of a mixture and substance containing a

detectable amount of marijuana, a Schedule I controlled substance, knowing and intending that

such substance would be imported into the United States from Mexico; all in violation of Title

21, United States Code, Sections 959, 960, 963, and Title 18, United States Code, Section 2.

## OBJECT OF THE CONSPIRACY

2.      It was the object of the conspiracy to acquire, sell, and distribute cocaine and marijuana and to transport such cocaine and marijuana out of Mexico and import it into the United States.

## MANNER AND MEANS OF THE CONSPIRACY

3.      For all periods of time relevant to the charges contained in this Superseding Indictment, the defendants and other co-conspirators, both known and unknown to the Grand Jury, used the following manner and means to accomplish the goals of the conspiracy:

A.      The defendants were members of either one of two Mexican-based narcotics trafficking organizations, the "Gulf Coast Cartel" and "Los Zetas," which organizations operated together under the name of "The Company," (hereinafter referred to as "The Company").

B.      The Company was led primarily by a governing council or "triumvirate" composed of three of the defendants, **CARDENAS-GUILLEN, COSTILLA,** and **LAZCANO**.

C.      The Company controlled hundreds of miles of Mexican territory along the border of Mexico and the United States, including the border of Mexico and Texas.

D.      The Company divided its territory into areas known as "plazas" along the Mexico-United States border and assigned each plaza region a leader known as a "plaza boss."

E.      **CARDENAS-GUILLEN, COSTILLA,** and **LAZCANO** directed the transportation of The Company's cocaine and marijuana shipments via boats, planes, and

automobiles from Colombia and Venezuela to Guatemala, and to various cities and "plazas" in Mexico.

F.      Under the direction of **CARDENAS-GUILLEN, COSTILLA,** and **LAZCANO,** The Company transported shipments of cocaine and marijuana by means of motor vehicles from Mexico to cities in Texas for distribution to other cities within the United States.

G.      The defendants, along with other members of The Company, organized, directed, and carried out various acts of violence against Mexican law enforcement officers and rival drug traffickers to retaliate against and to intimidate any individual or individuals who interfered with or who were perceived to potentially interfere with the cocaine and marijuana trafficking activities of The Company.

H.      The defendants and other members of the The Company utilized Nextel "push-to-talk" telephones and UHF/VHF radio communications to coordinate shipments of cocaine and marijuana and to evade law enforcement surveillance.

I.      The defendants and other members of the The Company utilized sophisticated record keeping programs by means of laptop computers and "flashdrive" memory-storage devices, which maintained a comprehensive database that included records of cocaine shipment amounts, plaza boss identities and plaza locations, payroll amounts, payments made to law enforcement officials, and money received and owed.

J.      The defendants and other members of the The Company often spoke in coded language during telephone conversations to disguise and conceal the nature of their cocaine and marijuana trafficking activities.

K.     The individual roles performed within The Company organization by each of the defendants were as follows:

1.      ***ANTONIO EZEQUIEL CARDENAS-GUILLEN***, *a.k.a. "Tony Tormenta."*  **CARDENAS-GUILLEN** was one of the three leaders of the The Company.  **CARDENAS-GUILLEN** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

2.      ***JORGE EDUARDO COSTILLA-SANCHEZ***, *a.k.a. "El Cos," a.k.a. "Doble X," a.k.a. "Dos Equis."*  **COSTILLA** was one of the three leaders of The Company.  **COSTILLA** was actively involved in managing the activities of the Gulf Cartel in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

3.      ***HERIBERTO LAZCANO-LAZCANO***, *a.k.a. "Lazca,"  a.k.a. "El Licenciado."*  **LAZCANO** was one of three leaders of The Company. **LAZCANO** was the leader of Los Zetas and the security chief for the Gulf Cartel.  **LAZCANO** was actively involved in managing the activities of the Gulf Cartel and the Los Zetas in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

4.      ***MIGUEL TREVINO MORALES***, *a.k.a. "40," a.k.a. "Zeta 40,": a.k.a. "Cuarenta."*  **MIGUEL TREVINO MORALES** was a ranking member of

the Los Zetas and was recognized as the second in command of the Los Zetas.

**MIGUEL TREVINO MORALES** was actively involved in managing the activities of the Gulf Cartel and the Los Zetas in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

**MIGUEL TREVINO MORALES** oversaw and supervised activities of The Company in certain areas in Mexico near the United States border, including those areas in and around Veracruz and Nuevo Laredo, Mexico.

5.     ***JAIME GONZALEZ-DURAN,*** *a.k.a. "Hummer."*  **GONZALEZ-DURAN** was an original member of the Los Zetas and served as a regional commander of the Los Zetas.  In this position,  **GONZALEZ-DURAN** oversaw and supervised activities of The Company in certain areas in Mexico near the United States border, including those areas in and around Nuevo Laredo, Miguel Aleman, and Reynosa, Mexico.  **GONZALEZ-DURAN** was actively involved in the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

6.     ***SAMUEL FLORES BORREGO***, *a.k.a. "Tres," a.k.a. "Metro Tres."*  **FLORES BORREGO** was a ranking member of the Gulf Cartel and was in  control of The Company's operations in and around Reynosa and Miguel Aleman, Mexico.  **FLORES BORREGO** obtained and provided information to members of The Company regarding certain law enforcement operations directed against The Company.  **FLORES BORREGO** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine

and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

7.      ***MARIO RAMIREZ-TREVINO***, *a.k.a. "Mario Pelon," a.k.a. "X-20."* **RAMIREZ-TREVINO** was a ranking member of the Gulf Cartel and was the second in command for the Gulf Cartel in and around Reynosa, Mexico. **RAMIREZ-TREVINO** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

8.      ***ALFREDO RANGEL BUENDIA***, *a.k.a. "Chicles."* **RANGEL** was a member of the Los Zetas who oversaw and assisted in the supervision of The Company's activities in and around Miguel Aleman, Mexico.  **RANGEL** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

9.      ***FIRST NAME UNKNOWN, LAST NAME UNKNOWN,*** *a.k.a. "Lino."* ("**LINO**").  **LINO** was a Gulf Cartel member and recognized as one of the primary accountants for The Company.  **LINO** was involved in the receipt of bulk currency shipments from the United States to Nuevo Laredo, Mexico.

10.      ***GILBERTO BARRAGAN-BALDERAS,*** *a.k.a. "Tocayo."* **BARRAGAN-BALDERAS** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine shipments into the

United States, as well as the receipt of bulk currency shipments into Mexico from the United States.  **BARRAGAN-BALDERAS** obtained and provided information to members of The Company regarding law enforcement operations directed against "The Company."

11.   ***JUAN REYES MEJIA-GONZALEZ,*** *a.k.a. "R-1," a.k.a. "Kike," a.k.a. "Reyes."*  **MEJIA-GONZALEZ** was a member of the Gulf Cartel who facilitated and assisted the purchase of cocaine by The Company from sources of supply located in Central and South America.  **MEJIA-GONZALEZ** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

12.   ***OMAR TREVINO MORALES,*** *a.k.a. "42."*  **OMAR TREVINO MORALES** had a leadership role and oversaw The Company's activities in Coahuila, Mexico.  **OMAR TREVINO MORALES** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

13.   ***JESUS ENRIQUE REJON AGUILAR,*** *a.k.a. "Mamito," a.k.a. "Cabellero."*  **REJON AGUILAR** was an original member of the Los Zetas. Along with **OMAR TREVINO MORALES**, **REJON AGUILAR** oversaw The Company's activities in the Mexican state of Coahuila.  **REJON AGUILAR** was actively involved in managing the activities of The Company in Mexico,

including the coordination of cocaine and marijuana shipments into the United

States.

14.     ***ALFONSO LAM-LIU**, a.k.a. "Gordo Lam."*  **LAM-LIU** was a

member of the Gulf Cartel.  **LAM-LIU** was the plaza boss of Rio Bravo, Mexico.

**LAM-LIU** was actively involved in managing the activities of The Company in

Mexico, including the coordination of cocaine and marijuana shipments into the

United States, as well as the receipt of bulk currency shipments into Mexico from

the United States.

15.     ***ELEAZAR MEDINA ROJAS**, a.k.a. "El Chelelo."*  **MEDINA**

**ROJAS** was member of the Los Zetas who oversaw The Company's activities in

and around Monterrey, Mexico.   **MEDINA ROJAS** was actively involved in

managing the activities of The Company in Mexico, including the coordination of

cocaine and marijuana shipments into the United States.

16.     ***AURELIO CANO-FLORES**, a.k.a. "Yankee," a.k.a. "Yeyo."*

**CANO-FLORES** oversaw The Company's activities in Camargo, Mexico, and

was involved in the procurement of bulk quantities of cocaine and heroin for The

Company.   **CANO-FLORES** was actively involved in managing the activities of

The Company in Mexico, including the coordination of cocaine and marijuana

shipments into the United States, as well as the receipt of bulk currency shipments

into Mexico from the United States.

17.     ***CARLOS CERDA-GONZALEZ**, a.k.a. "Puma," a.k.a.*

*"Carlitos."*  CERDA-GONZALEZ was actively involved in The Company's

activities in the Tampico, Mexico, including the procurement of

multiple-thousand kilogram shipments of cocaine.   **CERDA-GONZALEZ** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

18.   ***VICTOR HUGO LOPEZ-VALDEZ***, *a.k.a. "Jorge Hernandez-Martinez,"a.k.a. "Chiri," a.k.a. "Chiriquas."* **LOPEZ-VALDEZ** worked for **LAZCANO**.  **LOPEZ-VALDEZ** handled personal and business matters for **LAZCANO** related to The Company's activities, including placing and receiving telephone calls to other members of The Company to assist in the coordination of cocaine and marijuana shipments from Mexico into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

19.   ***SIGIFREDO NAJERA-TALAMANTES***, *a.k.a. "Canicon," a.k.a. "Chito,"a.k.a. "Chito Can," a.k.a. "Chito Canico," a.k.a. "Chito Canicon."* **NAJERA-TALAMANTES** was a member of the Los Zetas served as the plaza boss in and around Monterrey, Mexico.  **NAJERA-TALAMANTES** was actively involved in managing the activities of The Company in Mexico, including the coordination of cocaine and marijuana shipments into the United States, as well as the receipt of bulk currency shipments into Mexico from the United States.

## OVERT ACTS

4.      In furtherance of the conspiracy and to effect the objects thereof, the defendants, along with other co-conspirators both known and unknown to the Grand Jury, within Mexico the following overt acts ("OA#") were committed, among others:

OA1.      On or about June 5, 2006, **NAJERA-TALAMANTES** purchased fifteen kilograms of cocaine from The Company, at a price of $13,500 per kilogram, for a total purchase price of $202,500.00.

OA2.      On or about June 23, 2006, **NAJERA-TALAMANTES** purchased ten kilograms of cocaine from The Company, at a price of $13,500 per kilogram, for a total purchase price of $135,000.00.

OA3.      On or about July 20, 2006, **NAJERA-TALAMANTES** purchased twenty kilograms of cocaine from The Company, at a price of $13,500 per kilogram, for a total purchase price of $270,000.00.

OA4.      On or about August 17, 2006, **NAJERA-TALAMANTES** purchased twenty kilograms of cocaine from The Company, at a price of $13,500 per kilogram, for a total purchase price of $270,000.00.

OA5.      In a telephone conversation on or about October 21, 2006, **MIGUEL TREVINO MORALES** told **GONZALEZ-DURAN** that bonuses are paid according to the plaza in which the members work, that bonuses are paid according to seniority, and that bosses receive bonuses of $10,000.00.

OA6.      In a telephone conversation on or about October 21, 2006, **GONZALEZ-DURAN** asked **MIGUEL TREVINO MORALES** for marijuana;

**MIGUEL TREVINO MORALES** offered **GONZALEZ-DURAN** 200,000 kilograms; and **GONZALEZ-DURAN** said that he only wanted 1000 kilograms.

OA7.      In a telephone conversation on or about February 6, 2007, **COSTILLA** and **FLORES BORREGO** discussed The Company's successful receipt of 1300 kilograms of cocaine that was to be sent to **RAMIREZ-TREVINO** in Reynosa, Mexico.

OA8.      In a telephone conversation on or about February 7, 2007, **LINO** and **FLORES BORREGO** discussed the arrival of 192 kilograms of cocaine and the loss of 400 kilograms cocaine.

OA9.      In a telephone conversation on or about February 8, 2007, **LOPEZ-VALDEZ** told **GONZALEZ-DURAN** that **LAZCANO** wanted to know what was the price The Company charged for a kilogram of marijuana in Reynosa, Mexico. **GONZALEZ-DURAN** replied that they were selling it for between $150 and $170 per kilogram. **LOPEZ-VALDEZ** asked **GONZALEZ-DURAN** if that was for the good stuff and **GONZALEZ-DURAN** replied that if it was the good stuff, he could buy it for $100 per kilogram and sell it for as much as $180 or $190.

OA10.      In a telephone conversation on or about February 10, 2007, **COSTILLA** and **FLORES BORREGO** discussed the mode of transportation for 400 kilograms of cocaine, which was to be placed in a hidden compartment concealed within a gasoline tank.

OA11.      In a telephone conversation on or about February 10, 2007, **COSTILLA** and **FLORES BORREGO** discussed imposing a fee of $20,000 per week

for an individual who was transporting marijuana through Reynosa, Mexico, which

**FLORES BORREGO** described to **COSTILLA** as "your place."

OA12.        During three telephone conversations on or about February 21,

2007, **COSTILLA** asked for the name and number of the guy in charge of the plaza at

Nuevo Laredo, Mexico and **GONZALEZ-DURAN** confirmed to **COSTILLA** that

**MIGUEL TREVINO MORALES** was in charge of the plaza at Nuevo Laredo.  In the

course of one of the conversations, **GONZALEZ-DURAN** referred to **COSTILLA** as

"boss."

OA13.        In a telephone conversation on or about March 1, 2007,

**RAMIREZ-TREVINO** and **FLORES BORREGO** discussed in coded language the

seizure of 7000 kilograms of marijuana that were en route to Reynosa, Mexico –

McAllen, Texas border.  **RAMIREZ-TREVINO** stated that the marijuana belonged to

him.

OA14.        In a telephone conversation on or about March 1, 2007,

**RAMIREZ-TREVINO** and **FLORES BORREGO** discussed a pending shipment of

200 kilograms of cocaine to cross from Reynosa, Mexico to McAllen, Texas.

OA15.        In a telephone conversation on or about March 1, 2007,

**COSTILLA** and **FLORES BORREGO** discussed **FLORES BORREGO** obtaining

contact information for a source of supply of cocaine in Colombia so that they would

have better access to multiple kilogram quantities of cocaine.  **COSTILLA** told

**FLORES BORREGO** that, since 1996, he had worked in Chiapas, which is a Mexican

state located on Mexico's southern border with Guatemala.

OA16.    In a telephone conversation on or about March 7, 2007, **REJON AGUILAR** and **FLORES BORREGO** discussed a parked vehicle that **FLORES BORREGO** was having difficulty moving across the border into the United States because of an increased military and law enforcement presence in the area where they usually cross.  **REJON AGUILAR** told **FLORES BORREGO** that he has a crossing that he uses to cross 70 to 100 kilograms of cocaine at a time and that it is a sure thing.

OA17.    In a telephone conversation on or about March 9, 2007, **LAM-LIU** told **GONZALEZ-DURAN** about an individual with a 400 kilogram shipment of marijuana that **LAM-LIU** received in Rio Bravo (Mexico).  **LAM-LIU** stated that he would not charge the individual any fees or taxes because the individual was a friend of **LAM-LIU**.  **LAM-LIU** further told **GONZALEZ-DURAN** that part of the marijuana shipment was going to **GONZALEZ-DURAN's** area.  **GONZALEZ-DURAN** agreed that the individual should not be charged.

OA18.    In a telephone conversation on or about March 26, 2007, **FLORES BORREGO** told **MIGUEL TREVINO MORALES** that The Company's shipping cost per kilogram for marijuana was twenty dollars.  **MIGUEL TREVINO MORALES** told **FLORES BORREGO** to get him some enclosed trucks.  **MIGUEL TREVINO MORALES** stated to **FLORES BORREGO** that he has control of the Ministerial Police throughout the State of Veracruz, Mexico.

OA19.    In a telephone conversation on or about March 26, 2007, **OMAR TREVINO MORALES** told **GONZALEZ-DURAN** that **OMAR TREVINO MORALES's** people were moving more bulk currency in a grey Chevrolet Avalanche sport utility vehicle with Tamaulipas plates.

OA20.        In a telephone conversation on or about April 5, 2007, **RAMIREZ-TREVINO** and **FLORES BORREGO** discussed in coded language the seizure in Roma, Texas of kilograms of cocaine which were shipped from Miguel Aleman, Mexico through Valadeces, Mexico.

OA21.        In a telephone conversation on or about April 6, 2007, **GONZALEZ-DURAN** asked **MEDINA ROJAS** whether a certain individual purchased kilograms of cocaine from **MEDINA ROJAS**.  **MEDINA ROJAS** said he would check into the matter.  **MEDINA ROJAS** then confirmed to **GONZALEZ-DURAN** that another individual about whom **GONZALEZ-DURAN** had earlier inquired is not a member of The Company.

OA22.        In a telephone conversation on or about April 9, 2007, **OMAR TREVINO MORALES** and **FLORES BORREGO** discussed in coded language whether **FLORES BORREGO** could provide **OMAR TREVINO MORALES** with a person to move cocaine across the border from Mexico into the United States.  **OMAR TREVINO MORALES** stated that he had 800 kilograms.  **OMAR TREVINO MORALES** and **FLORES BORREGO** further agreed to send the cocaine over the border in increments of 250 kilograms.  During the conversation, **FLORES BORREGO** referred to **OMAR TREVINO MORALES** as "boss."

OA23.        In a coded telephone conversation on or about April 10, 2007, **CERDA-GONZALEZ** told **GONZALEZ-DURAN** that **GONZALEZ-DURAN** still owed **CERDA-GONZALEZ** money for some kilograms of cocaine that **CERDA-GONZALEZ** gave him in November 2006.  **GONZALEZ-DURAN** asked **CERDA-GONZALEZ** if he had forgotten to pick up the money for the cocaine, and **CERDA-**

**GONZALEZ** replied that he did pick up the money but it was short $55,000.

**GONZALEZ-DURAN** then told **CERDA-GONZLEZ** that he would check with his colleagues and check the records, and that he would get the $55,000 to **CERDA-GONZALEZ**.  After they agreed on resolving the debt matter, **CERDA-GONZALEZ** told **GONZALEZ-DURAN** that **CERDA-GONZALEZ** would deliver the kilograms of cocaine that **GONZALEZ-DURAN** ordered on Friday or, at the latest, on Monday.

OA24.      In a telephone conversation on or about April 28, 2007, **FLORES BORREGO** told **COSTILLA** that he received a load of cocaine from a Colombian. **COSTILLA** and **FLORES BORREGO** also discussed the seizure of 5000 kilograms of The Company's cocaine and payment  to **COSTILLA** for a shipment of marijuana.

OA25.      In a telephone conversation on or about May 1, 2007, **CARDENAS-GUILLEN** and **FLORES BORREGO** discussed in coded language putting together a shipment of 300 kilograms of cocaine sent to McAllen, Texas.

OA26.      In a telephone conversation on or about May 8, 2007, **RAMIREZ-TREVINO** and **FLORES BORREGO** discussed in coded language **COSTILLA's** approval and arrangement of a bribe of $2,000,000 to Mexican government officials.

OA27.      In a telephone conversation on or about May 10, 2007, **CARDENAS-GUILLEN** and **FLORES BORREGO** discussed in coded language a co-conspirator who was arrested with 300 kilograms of cocaine.  **CARDENAS-GUILLEN** told **FLORES BORREGO** to look into whether the arrested individual had "an accident" or robbed them of their cocaine.

OA28.      In a telephone conversation on or about May 11, 2007, **CARDENAS-GUILLEN** confirmed to **FLORES BORREGO** that the individual

arrested with 300 kilograms of cocaine was "an accident."  **FLORES BORREGO** told

**CARDENAS-GUILLEN** that the individual is "locked up" but might get out on bail.

OA29.	In a coded telephone conversation on or about May 21, 2007,

**GONZALEZ-DURAN** and **MIGUEL TREVINO MORALES** discussed a shipment of

300 to 400 kilograms of cocaine that **NAJERA-TALAMANTES** was transporting to

**GONZALEZ-DURAN** from **MIGUEL TREVINO MORALES**.  **GONZALEZ-**

**DURAN** agreed to send someone to pick up the cocaine in Rio Bravo, Mexico and

transport it to Miguel Aleman, Mexico using a Chevrolet Avalanche sport utility vehicle.

OA30.	In a telephone conversation on or about May 23, 2007, **LINO** and

**FLORES BORREGO** discussed a fifty-kilogram cocaine order for **MEJIA-**

**GONZALEZ**.

OA31.	In a telephone conversation on or about May 29, 2007 with

**GONZALEZ-DURAN**, **LAZCANO** used coded language to establish $12,000 as The

Company's selling price for kilograms of cocaine.

OA32.	In a telephone conversation on or about May 29, 2007,

**GONZALEZ-DURAN** told **FLORES BORREGO** that **LAZCANO** set the selling price

for The Company's cocaine at $12,000 per kilogram.

OA33.	In a telephone conversation on or about June 5, 2007,

**GONZALEZ-DURAN** agreed to buy fifty kilograms of cocaine at a price of $12,000 per

kilogram from **CERDA-GONZALEZ**.

OA34.	In a telephone conversation on or about June 6, 2007, **MIGUEL**

**TREVINO MORALES** told **FLORES BORREGO** to transport 400 kilograms of

cocaine through Camargo, Mexico into Rio Grande City, Texas.  **FLORES BORREGO**

then told **MIGUEL TREVINO MORALES** that he would move the cocaine across fifty

kilograms at a time to keep it safe and cut losses.

OA35.　　　On or about June 7, 2007, **LAZCANO** , **FLORES BORREGO**,

and others convened a leadership meeting for the purpose of planning and coordinating

The Company's cocaine and marijuana trafficking activities.

OA36.　　　On or about June 8, 2007,  **COSTILLA** and **FLORES**

**BORREGO** discussed the seizure, by law enforcement agents in Texas, of approximately

$2,700,000 concealed in a grey Chevrolet Avalanche sport utility vehicle with

Tamaulipas plates.  **COSTILLA** and **FLORES BORREGO** specifically discussed a

claim by **GONZALEZ-DURAN** that the seized currency belonged to **MIGUEL**

**TREVINO MORALES**.

OA37.　　　In a telephone conversation on or about June 20, 2007, **MIGUEL**

**TREVINO MORALES** told **FLORES BORREGO** that he wanted him to manage the

transport of a shipment of cocaine into McAllen, Texas.

OA38.　　　In a coded telephone conversation on or about June 21, 2007,

**MEJIA-GONZALEZ** told **GONZALEZ-DURAN** that he received a load of bulk

currency and would conceal it into a hidden compartment of a tractor trailer filled with

produce, which they would transport to Tampico, Mexico.   **MEJIA-GONZALEZ** and

**GONZALEZ-DURAN** also discussed having Colombian cocaine suppliers visit Mexico

to negotiate payments for bulk shipments of cocaine.

OA39.　　　In a coded telephone conversation on or about June 24, 2007,

**LOPEZ-VALDEZ** asked **GONZALEZ-DURAN** if **LAZCANO** spoke to

**GONZALEZ-DURAN** last night about a supply of  marijuana.  **GONZALEZ-DURAN**

said that he heard from **OMAR TREVINO MORALES**, who said he was going to send

the marijuana to **MEJIA-GONZALEZ** and **FLORES-BORREGO**.  **GONZALEZ-**

**DURAN** also said that he told **MEJIA-GONZALEZ** and **FLORES-BORREGO** that he

was going to help them transport about 2000 kilograms of marijuana.  **LOPEZ-**

**VALDEZ** told **GONZALEZ-DURAN** that the marijuana belonged to **LAZCANO**.

**GONZALEZ-DURAN** said that if that marijuana belonged to **LAZCANO** then there

would be no problem and that they would bring it to Reynosa, Mexico.  **LOPEZ-**

**VALDEZ** repeated that the 2000 kilograms of marijuana belonged to **LAZCANO**.

OA40.    In a telephone conversation on or about June 25, 2007, **MEJIA-**

**GONZALEZ** and **FLORES BORREGO** discussed the payment terms of a pending

shipment of cocaine from Venezuela to Tampico, Mexico.

OA41.    Beginning on or about June 25, 2007, and continuing until October

5, 2007, members of The Company, including **MIGUEL TREVINO MORALES,**

**FLORES BORREGO,** and **MEJIA-GONZALEZ**, made logistical preparations in and

around Altamira, Mexico and Tampico, Mexico, to receive thousands of kilograms, of

cocaine from Colombia, which preparations included obtaining warehouse space.

OA42.    In a telephone conversation on or about June 26, 2007, **REJON**

**AGUILAR** asked  **FLORES BORREGO** for some marijuana.  **FLORES BORREGO**

said he has people who get good quality for $150 per kilogram.  **REJON AGUILAR** told

**FLORES BORREGO** that he has a client who will purchase 20,000 pounds at once.

OA43.    In a telephone conversation on or about June 30, 2007, **CANO-**

**FLORES** and **MEJIA-GONZALEZ** discussed in coded language a deal in which

**CANO-FLORES** would provide **MEJIA-GONZALEZ** between 500 to 1000 kilograms

of marijuana belonging to The Company at a price of $150 per kilogram.  **MEJIA-GONZALEZ** told **CANO-FLORES** that he would bring the money from Laredo as soon as a military checkpoint moved, which he estimated would be in one hour.

OA44.      In a telephone conversation on or about July 10, 2007, **CANO-FLORES** and **FLORES BORREGO** discussed in coded language **CANO-FLORES's** delivery of $2,000 and some marijuana to **FLORES BORREGO**.

OA45.      In a telephone conversation on or about July 24, 2007, **MIGUEL TREVINO MORALES** ordered **GONZALEZ-DURAN** to contact an individual and to tell him that only "Company" freight is allowed to pass through Camargo, Mexico.

OA46.      In a telephone conversation on or about August 17, 2007, **FLORES BORREGO** told **CARDENAS-GUILLEN** in coded language that he has fifty kilograms of cocaine for **CARDENAS-GUILLEN** in order to lower the account with **CARDENAS-GUILLEN**, and that he would pay the rest in a few more days.

OA47.      In a telephone conversation on or about September 23, 2007, **CARDENAS-GUILLEN** and **FLORES BORREGO** discussed in coded language the shipment and sale of 1000 kilograms of marijuana and a pending cocaine shipment.

OA48.      On or about October 5, 2007, in Altamira, Mexico and Tampico, Mexico, and elsewhere in Mexico, members of The Company, including **CARDENAS-GUILLEN**,  **COSTILLA**, **LAZCANO**, **MIGUEL TREVINO MORALES**, **FLORES BORREGO**, **RAMIREZ-TREVINO**, **RANGEL**, **LINO,  MEJIA-GONZALEZ,** and **CERDA-GONZALEZ,** possessed and distributed  approximately 11,700 kilograms of cocaine, which they intended to ship to the United States.

OA49.        In a telephone conversation on or about October 12, 2007,

**MEJIA-GONZALEZ** told **FLORES BORREGO**, in coded language, that **RANGEL**

was telling everyone that the investors in the cocaine recently seized in Altamira, Mexico

had seventy-two hours to pay the money they owed or they would be killed.

OA50.        In a telephone conversation on or about October 13, 2007,

**RANGEL** and **FLORES BORREGO** discussed in coded language the terms of a

shipment of 100 kilograms of marijuana to McAllen, Texas.

OA51.        In a telephone conversation on or about November 24, 2007,

**LAZCANO** ordered **RANGEL** to maintain an aircraft or helicopter with a pilot in

**RANGEL**'s plaza.

OA52.        In a telephone conversation on or about November 24, 2007,

**LAZCANO** and **RANGEL** discussed **RANGEL**'s delivery of $1,700,000 to purchase

2500 to 3000 kilograms of marijuana.

OA53.        In a telephone conversation on or about November 26, 2007 with

an unknown male, **RANGEL** identified himself as "Commander Chicles" from Miguel

Aleman.

OA54.        On or about November 30, 2007, in Colon, Panama, and in

Mexico, defendants **COSTILLA,  RAMIREZ-TREVINO,   FLORES BORREGO,**

**BARRAGAN-BALDERAS**, and other members of The Company possessed and

distributed approximately 2400 kilograms of cocaine, which they intended to ship to the

United States.

OA55.        In a telephone conversation on or about December 8, 2007,

**BARRAGAN-BALDERAS** and **FLORES BORREGO** discussed the recent seizure of

2400 kilograms of The Company's cocaine in Panama and discussed who was responsible for the seizure and how they would recover from the seizure.

OA56.    In a telephone conversation on or about February 18, 2008, **BARRAGAN-BALDERAS** and **FLORES BORREGO** discussed movement of a fifteen kilogram shipment of cocaine.

OA57.    In a telephone conversation on or about February 18, 2008, **BARRAGAN-BALDERAS** and **FLORES BORREGO** discussed the shipment of fifty kilograms of cocaine through McAllen, Texas to Tennessee, where **BARRAGAN-BALDERAS** expected to receive $23,000 per kilogram.

OA58.    In a telephone conversation on or about March 4, 2008, **BARRAGAN-BALDERAS** and **FLORES BORREGO** discussed distribution of 5000 kilograms of marijuana to four individuals, including 1000 kilograms to **GONZALEZ-DURAN**.  **BARRAGAN-BALDERAS** and **FLORES BORREGO** further discussed **MEJIA-GONZALEZ** and another individual assisting in storage of the marijuana.

## <u>COUNT TWO</u>
### DISTRIBUTION OF COCAINE
### FOR IMPORTATION INTO THE UNITED STATES

On or about October 5, 2007, in Mexico, the defendants, **ANTONIO EZEQUIEL CARDENAS-GUILLEN**,  a.k.a. "Tony Tormenta"; **JORGE EDUARDO COSTILLA-SANCHEZ**, a.k.a. "El Cos," a.k.a. "Doble X," a.k.a. "Dos Equis"; **HERIBERTO LAZCANO-LAZCANO**, a.k.a. "Lazca," a.k.a. "El Licenciado"; **MIGUEL TREVINO MORALES**, a.k.a. "40," a.k.a. "Zeta 40," a.k.a. "Cuarenta"; **SAMUEL FLORES BORREGO**, a.k.a. "Tres," a.k.a. "Metro Tres"; **MARIO RAMIREZ-TREVINO**, a.k.a. "Mario Pelon," a.k.a. "X20";

**ALFREDO RANGEL BUENDIA**, a.k.a. "Chicles"; **FIRST NAME UNKNOWN, LAST NAME UNKNOWN**, a.k.a. "Lino"; **JUAN REYES MEJIA-GONZALEZ**, a.k.a. "R-1," a.k.a. "Kike," a.k.a. "Reyes"; and **CARLOS CERDA-GONZALEZ,** a.k.a. "Puma," a.k.a. "Carlitos" did unlawfully, knowingly, and intentionally distribute and cause the distribution of five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such cocaine would be unlawfully imported into the United States; all in violation of Title 21, United States Code, Sections 959 and Title 18, United States Code, Section 2.

**COUNT THREE**
**DISTRIBUTION OF COCAINE**
**FOR IMPORTATION INTO THE UNITED STATES**

On or about November 30, 2007,  in Panama and in Mexico, the defendants, **JORGE EDUARDO COSTILLA-SANCHEZ**, a.k.a. "El Cos," a.k.a. "Doble X," a.k.a. "Dos Equis"; **MARIO RAMIREZ-TREVINO**, a.k.a. "Mario Pelon," a.k.a. "X-20"; **SAMUEL FLORES BORREGO**, a.k.a. "Tres," a.k.a. "Metro"; and **GILBERTO BARRAGAN-BALDERAS**, a.k.a. "Tocayo" did unlawfully, knowingly, and intentionally distribute and cause the distribution of five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such cocaine would be unlawfully imported into the United States; all in violation of Title 21, United States Code, Sections 959 and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

The violations alleged in Count One, Count Two and Count Three are re-alleged and incorporated by reference herein.  As a result of the offenses alleged in Count One, Count Two and Count Three, the defendants, **ANTONIO EZEQUIEL CARDENAS-GUILLEN**, a.k.a. "Tony Tormenta"; **JORGE EDUARDO COSTILLA-SANCHEZ**, a.k.a. "El Cos," a.k.a. "Doble X," a.k.a. "Dos Equis"; **HERIBERTO LAZCANO-LAZCANO**, a.k.a. "Lazca," a.k.a. "El Licenciado"; **MIGUEL TREVINO MORALES**, a.k.a. "40," a.k.a. "Zeta 40," a.k.a. "Cuarenta"; **JAIME GONZALEZ-DURAN,** a.k.a. "Hummer"; **SAMUEL FLORES BORREGO**, a.k.a. "Tres," a.k.a. "Metro Tres"; **MARIO RAMIREZ-TREVINO**, a.k.a. "Mario Pelon," a.k.a. "X-20" **ALFREDO RANGEL BUENDIA**, a.k.a. "Chicles";  **FIRST NAME UNKNOWN, LAST NAME UNKNOWN,** a.k.a. "Lino";  **GILBERTO BARRAGAN-BALDERAS,** a.k.a. "Tocayo"; **JUAN REYES MEJIA-GONZALEZ,** a.k.a. "R-1," a.k.a. "Kike," a.k.a. "Reyes";  **OMAR TREVINO MORALES,** a.k.a. "42,"; **JESUS ENRIQUE REJON AGUILAR,** a.k.a. "Mamito," a.k.a. "Cabellero"; **ALFONSO LAM-LIU**, a.k.a. "Gordo Lam"; **ELEAZAR MEDINA ROJAS,** a.k.a. "El Chelelo"; **AURELIO CANO-FLORES,** a.k.a. "Yankee," a.k.a. "Yeyo"; **CARLOS CERDA-GONZALEZ,** a.k.a. "Puma," a.k.a. "Carlitos"; **VICTOR HUGO LOPEZ-VALDEZ**, a.k.a. "Jorge Hernandez-Martinez,"a.k.a. "Chiri," a.k.a. "Chiriquas"; **SIGIFREDO NAJERA-TALAMANTES**, a.k.a. "Canicon," a.k.a. "Chito,"a.k.a. "Chito Can," a.k.a. "Chito Canico," a.k.a. "Chito Canicon" shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all respective right, title, or interest which such defendants may have in (1) any and all money and/or property constituting, or derived from any proceeds which such defendants obtained, directly or indirectly, as the result of the violations alleged in Count One, Count Two and Count Three of this

Indictment and (2) any and all property used, in any manner or part, to commit, or to facilitate the commission of the violations alleged in Counts One, Two and Three of this Indictment.

If any of said forfeitable property, as a result of any act or omission of the defendants, (a) cannot be located upon the exercise of due diligence, (b) has been transferred or sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property which cannot be subdivided without difficulty, it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the said property.  Criminal forfeiture, in violation of Title 21, United States Code, Sections 853 and 970.

A TRUE BILL:

_____
FOREPERSON

_____
Paul M. O'Brien, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530

_____        _____
Patrick H. Hearn, Trial Attorney              John M. Gillies, Trial Attorney
Narcotic and Dangerous Drug Section       Narcotic and Dangerous Drug Section
Criminal Division                                     Criminal Division
U.S. Department of Justice                        U.S. Department of Justice
Washington, D.C. 20530                          Washington, D.C. 20530